UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

GEOFFREY KROLL,                          )
            Plaintiff,                   )
                                         )
      vs.                                )          1:03-CV-1603-SEB-VSS
                                         )
PRUDENTIAL INSURANCE COMPANY )
OF AMERICA and FINISHMASTER,  )
INC. LONG TERM DISABILITY PLAN, )
            Defendants.                   )
                                         )

## ENTRY GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on Plaintiff's and Defendants' Cross-Motions

for Summary Judgment on all the claims presented in the Complaint filed by Plaintiff

Geoffrey Kroll ("Mr. Kroll") on October 31, 2003.  Mr. Kroll brought this action under

the Federal Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §

1001, et. seq.  claiming a wrongful denial of benefits by Defendant Prudential Insurance

Company of America ("Prudential"), pursuant to 29 U.S.C. § 1132(a)(1)(B).  Defendants

contend that, based on the administrative record, Mr. Kroll was not and is not disabled

pursuant to the definition of "disability" in the governing ERISA plan because he is not

unable to perform the job functions of his own occupation.  The Court, having fully

considered the parties' arguments, for the reasons discussed below, GRANTS Plaintiff's

Motion for Summary Judgment, DENIES Defendants' Motion for Summary Judgment,

and REMANDS this matter to Prudential for further consideration consistent with this

opinion.

Factual Background

A.    *Administrative Procedure Summary.*

As an employee of Finishmaster, Inc. ("Finishmaster"), Mr. Kroll was covered under the Lacy Diversified Industries, Ltd., Long Term Disability ("LTD") Plan (the "Plan"), which is funded and administered by Prudential.  (AR 00011-00012)[1]  On January 1, 2001, Prudential issued to Finishmaster, Inc. an LTD insurance policy, Group Policy Number 39806 (the "Policy").   (Answer, ¶ 7)  Prudential was responsible for determining eligibility for LTD benefits under the Policy and the Plan.  (Answer, ¶ 4)

Mr. Kroll initially left his job on September 11, 2001, based on complaints of migraine headaches.  (AR 00043-44, 00195)  On March 27, 2002, he filed for LTD benefits.  (AR 00041-49)  On May 30, 2002, Prudential denied his claim for LTD benefits.  (AR 00130-132)  On September 10, 2002, Prudential affirmed its decision and denied Mr. Kroll's first appeal.  (AR 00168-170)  On May 20, 2003, Prudential again upheld its decision and denied Mr. Kroll's second appeal.  (AR 00255-256)

B.    *Plan Language*

The Plan contains the following language:

This Coverage pays benefits when you have a long period of

---

[1] Items in Mr. Kroll's medical file are referenced by their Bates control number.  Often the same document will appear multiple times in the medical file, each time with a different Bates numbers.  For simplicity, when referencing a document, we list only one of the several Bates control numbers.

Disability.  Those benefits start after an Elimination Period.
*       *       *

"Total Disability" exists when Prudential determines that . . . :

(1)      Due to Sickness or accidental Injury, both of these are true:

        (a)      You are not able to perform, for wage or profit, the material and substantial duties of your occupation.

        (b)      After the Initial Duration of a period of Total Disability, you are not able to perform for wage or profit the material and substantial duties of any job duties of any job for which you are reasonably fitted by education, training or experience.

(AR 00026)

Initial Duration: The Elimination Period plus 24 months.

Elimination Period:

For each period of Disability due to Sickness or accidental injury, a period extending from the start of the period of Disability to  . . .

      (a) The end of the first 26 weeks of continuous Disability.

(AR 00020)

### D. BENEFITS FOR EXPENSES OF REHABILITATION.
*       *       *

Prudential may determine, after consulting your Doctor, that . . . you should cease to be Disabled and be able to support yourself after being in such a program.

### E. BENEFIT LIMITATION
*       *       *

This Section applies if your Disability, as determined by Prudential, is caused at  least in part by a mental, psychoneurotic or personality disorder.

(AR 00028)

3

C.     *Mr. Kroll's Pre-Disability Claim History of Migraine Headaches.*

Mr. Kroll has suffered from migraine headaches beginning sometime between 1988 and 1989.  (AR 00276, AR 00284)  On February 29, 2000, Mr. Kroll's neurologist, Dr. Anne Marie Hake ("Dr. Hake"), confirmed that Mr. Kroll suffers from migraine headaches, noting that: "[Mr. Kroll] previously had headaches approximately once per week, but now they are occurring more than a week apart. They still last for about three days."  (AR 00176)  On April 4, 2000, Dr. Hake reported that Mr. Kroll's headaches seemed to be responding to Inderal.  (AR 00177)  On June 13, 2000, Dr. Hake noted that Mr. Kroll continued to suffer from headaches and that his  co-workers had "expressed concern about his irritability and depression."  (AR 00178)

On September 5, 2000, Mr. Kroll stopped taking Inderal and told Dr. Hake he had not noticed any difference in his headaches since discontinuing the medication.  Dr. Hake noted that Mr. Kroll "… estimates that he is now having headaches twice per week and each headache is lasting about three days."  Dr. Hake's impression was that Mr. Kroll suffered from chronic migraines.  Dr. Hake gave Mr. Kroll a prescription for Verapamil. (AR 00181)

In January 2, 2001, Mr. Kroll told Dr. Hake that he frequently forgot to take his new medication, Verapamil, but that when he was off medication he did not notice any difference in his headaches.  At this visit Dr. Hake prescribed Oxycodone to Mr. Kroll. Dr. Hake again described Mr. Kroll as suffering from chronic migraines.  (AR 00182)

On March 19, 2001, Mr. Kroll had a brain MRI which showed no abnormalities.

4

(AR 00212)

On August 28, 2001, Dr. Hake recorded in her notations:

> He has been having a great deal of difficulty with his headaches in
> recent weeks and has had to have several visits to [IU Medical
> Center for] pain medications. He has a headache essentially every
> day. He typically awakens with a headache that he rates as a 4 on a
> scale of 1-10.  He has been taking Oxycodone, which bumps it down
> to a level of 1 or 2.

(AR 00183)  Dr. Hake also reported that Mr. Kroll was under "moderate distress" during

the exam and was having difficulties with anxiety and depression.  Finally, Dr. Hake

noted that Mr. Kroll suffers from chronic migraines that have worsened in recent months.

(AR 00183)

D.     *Mr. Kroll's Admission to the Indiana University Medical Center.*

Mr. Kroll was admitted to Indiana University ("IU") Medical Center on September

10, 2001, for treatment of migraines.[2]  Mr. Kroll's condition was described by hospital

personnel as follows:

> … stereotyped headaches involving right sided occipital/neck pain
> which radiates to his right eye and he describes it as a "piercing"
> head pain advancing through his right eye which is sometimes
> associated with "double vision."  The patient indicates that he has
> periods of headaches lasting up to several days and that headaches
> can persist for greater than ½ of each month. He describes a baseline
> headache of 2 out of 10 on a daily basis. On admission he describes a
> 5 out of 10 headache. [ ] He states that the current headache with
> which he is presenting has been ongoing for approximately 5 days

---

[2] Prior to his hospitalization on September 10, 2001, Mr. Kroll had been admitted more
than ten times in the prior two years to the IU Medical Center for treatment of his migraines.
(AR 00195)

now.

(AR 00195)

The hospital reported that, despite two days of treating Mr. Kroll with several different medications, he continued to report poor relief of his headache.  Only Demerol was reported by Mr. Kroll to have minimal effect in helping relieve his headache.  The hospital subsequently noted that Mr. Kroll  "continued to request Demerol on multiple occasions for relief of his head pain," and that, despite the use of Demerol at a rate of 75 mg every six hours, he continued to complain of "7 out of 10" head pain.  (AR 00197)

After the Demorol proved ineffective in quelling the headache pain, and since hospital personnel believed that Mr. Kroll had built up a tolerance to narcotics, given his "past extensive use of Oxycodone prior to admission," the treating doctors made the decision to attempt analgesia with Morphine.  After the analgesia with Morphine also proved ineffective in suppressing the pain, a Morphine PCA[3] was prescribed.  (AR 00197)  While receiving the Morphine PCA, nurses reportedly noted occasions when Mr. Kroll unplugged the "PCA, thereby clearing the memory of uses" and requested more Morphine.  Nurses also noted occasions when Mr. Kroll requested more Morphine syringes, when only a few of the current supply had been used.  Nurses also reported that Mr. Kroll was "no longer cutting or removing his I.V.'s after being told that he would not receive any more I.V. pain medication if he were to do so."  (AR 00198)

---

[3] We assume PCA refers to "patient controlled analgesia."

Mr. Kroll's Morphine PCA was ultimately discontinued and replaced with Methadone, Indocin, and other treatments such as two separate occipital nerve blocks. (AR 00197)  Once placed on Methadone and Indocin, Mr. Kroll described his pain as "a level between 0 and 1 out of 10."  (AR 00198)  Mr. Kroll was discharged on Methadone and advised to taper off it over time.  (AR 00198)

Mr. Kroll was discharged on September 22, 2001.  (AR 00195)  His discharge summary was dictated by Dr. Matthew Bain, hospital resident, on September 23, 2001, and subsequently signed by Dr. Hake.  (AR 00195, AR 00199 )  Mr. Kroll was reported as indicating that "his pain was very much relieved and that his anxiety level was much less that it had been previously."  (AR 00199)  The discharge summary reported that Mr. Kroll was "in good condition" upon discharge and was to follow-up with Dr. Hake.  (AR 00199)

The discharge summary noted that the Psychiatry consult and the Chronic Pain consult "both indicated a great amount of concern that the patient was abusing and possibly addicted to narcotics."  (AR 00198)  The Psychiatry consult indicated "affect and behavior did not match the pain."  (AR 00198)  The discharge summary further reported that "[t]here was concern that there may be some element of conversion with the patient's migraine headaches."  (AR 00198)

The discharge summary continued, indicating that "[t]hroughout the patient's hospitalization he manifested several disturbing and concerning behavior patterns."  (AR 00198)  Mr. Kroll reportedly demonstrated a consistent pattern of describing severe head

pain throughout most of his stay, but "was able to converse easily and was able to ambulate without difficulty and converse with nursing staff." (AR 00198) During this time, Mr. Kroll continued to "be very active on the floor pacing regularly and going down stairs frequently to smoke outside." (AR 00197) In addition, he was observed "on multiple occasions to be conversing with his wife and apparently in no acute distress, all the while requesting more Morphine." (AR 00197) Finally, the discharge summary reported that there was concern that Mr. Kroll and his wife were attempting to "pit certain members of the medical staff against others." (AR 00198)

Mr. Kroll's discharge diagnosis was listed as "migraine headache" and "narcotic abuse/addiction," (AR 00195) and concluded in these words: "It is the earnest belief of multiple services that have been involved with this patient's care, including Neurology, Chronic Pain, and Psychiatry that the patient is likely abusing if not addicted to narcotics and should not receive them while hospitalized." (AR 00198-199) However, there was no indication in the record that Mr. Kroll was taking any narcotics outside those prescribed and administered to him by the hospital nor is there any indication that the hospital staff believed Mr. Kroll had a narcotics problem prior to admission to the IU Medical Center or that physicians believed Mr. Kroll had faked his symptoms at the time of admission.

E.    *Mr. Kroll's Elimination Period Medical Records from Dr. Hake.*

In her office visit notes for October 9, 2001, Dr. Hake stated that Mr. Kroll's most severe headache since his hospital discharge was rated a "4/10" which was resolved by

8

his use of ice packs on his head.  Dr. Hake also noted that Mr. Kroll was "… having some jitteriness, sweating, and nervousness, especially when he first was discharged, but these symptoms have subsided." Dr. Hake concluded that Mr. Kroll's status was "post status migrainous and narcotic adverse effects. He is continuing to improve."  Dr. Hake stated that Mr. Kroll's "main problems at present are drowsiness, inattention, severe constipation, difficulty urinating, and erectile dysfunction."  (AR 00200)

On November 2, 2001, Dr. Hake reported that Mr. Kroll was continuing to taper his use of Methadone and that, upon attempting to decrease the frequency of his Methadone treatments, Mr. Kroll suffered headaches as severe as "7 out of 10." However, after an adjustment to his Methadone dosage, Dr. Hake indicated that Mr. Kroll's headaches were no worse that a "1 or 2 out of 10" and that Mr. Kroll "… has a little bit better energy and can tolerate activity for up to three hours at a time."  Dr. Hake repeated her conclusion that Mr. Kroll suffers from "[s]tatus post status migrainosus and narcotic adverse effects." (AR 00201)  Dr. Hake further proposed tapering Mr. Kroll's Methadone dosage by half over the course of three weeks.[4]  Dr. Hake observed that Mr. Kroll had continued to improve and gave him a note to return to work dated November 26.  (AR 00201)

After his November 1, 2001 office visit, Mr. Kroll ended his treatment with Dr.

---

[4] Dr. Hake proposed Mr. Kroll continue taking his current Methadone dosage of 5 mg every six hours for another week or so, then decreasing the dosage to 5 mg every eight hours for two weeks and then decreasing the dosage to 5 mg every twelve hours.  (AR 00201)

Hake and switched to a new neurologist, Dr. Caryn M. Vogel ("Dr. Vogel").[5]

F.    *Mr. Kroll's Elimination Period Medical Records from Dr. Vogel.*

Mr. Kroll first saw Dr. Vogel on December 4, 2001,[6] and Dr. Vogel diagnosed Mr. Kroll with refractory headaches.  Dr. Vogel opined that Mr. Kroll was disabled full time and that his return to work was "open ended."  (AR 00119)[7]


On December 17, 2001, Dr. Vogel reported that, following his initial visit, Mr. Kroll returned five days later to the office "demanding Demerol."  As of December 17, 2001, Mr. Kroll's headaches were reported as "somewhat better" after being put on a course of Thorazine and Medrol.  Although Dr. Vogel attempted to taper Mr. Kroll off the

---

[5]  In his first appeal, Mr. Kroll explained his decision to switch from Dr. Hake to Dr. Vogel as follows:

> … [Dr. Vogel] would have more expertise in [the headache] area and be more available. Dr. Hake works only one day per week in the outpatient clinic and the rest of her time specializes in Alzheimer research and treatment.

(AR 134)

[6]  The December 4, 2001, visit is alternatively described by Dr. Vogel as occurring on December 5, 2001.  (AR 00158)  This discrepancy is not explained in the record.

[7]  In Mr. Kroll's first appeal, he added that:

> Dr. Vogel, upon seeing me for the first time on 12-4-01, stated that I could not go back to work until I was off the methadone. The methadone significantly impaired my ability to sleep, my concentration, my memory and my activity tolerance.

(AR 134)

Methadone, Mr. Kroll reported that this worsened his headaches, which, according to him, had not changed at all in frequency or character.  Dr. Vogel wrote that her impression was that Mr. Kroll had "[refractory] longstanding migraine headaches complicated by analgesic abuse and dependency."  Dr. Vogel also noted that "[Mr. Kroll] can't really identify anything that tends to precipitate the headaches."  Dr. Vogel referred Mr. Kroll for medical acupuncture for pain treatment. (AR 00158)

On January 11, 2002, Dr. Vogel saw Mr. Kroll for his "intractable headaches," reporting that Mr. Kroll's brain magnetic resonance angiography was "unremarkable."[8] Mr. Kroll reported that his headaches were "a little better," but still continued daily.  (AR 00157)  Dr. Vogel noted that Mr. Kroll appeared pleasant and comfortable during the examination and found all other physical conditions such as neck, lungs, eyes, smile, and gait of Mr. Kroll to be normal.  Dr. Vogel reported that she would begin an attempt to taper Mr. Kroll off Methadone.[9]  After the visit, Dr. Vogel recorded that Mr. Kroll had refractory migraine headaches complicated by narcotic dependency.  (AR 00157)

On March 8, 2002, Dr. Vogel noted that Mr. Kroll "… is not doing much better. He still has days in which he feels incapacitated by his headache."   However, Dr. Vogel

---

[8] The radiology report dated December 12, 2001, stated that "no aneurysms or vascular malformations" were  demonstrated.  (AR 00165)

[9] As of this visit, Mr. Kroll was apparently still taking 5 mg of Methadone three times a day or, we assume, once every eight hours.  Dr. Vogel expressed hope that after one week of taking this dosage of Methadone combined with an increased dosage of Keppra that she would be able to reduce the Methadone dosage to 5 mg twice a day or, we assume, once every twelve hours.

stated that during the examination Mr. Kroll was a "pleasant and comfortable-appearing gentleman despite his complaint of headache."  Dr. Vogel concluded that Mr. Kroll's headaches were "complicated by analgesic overuse and Methadone dependency."  (AR 00152)

G.    *Mr. Kroll's Post-Elimination Period Medical Records.*

On March 22, 2002, Dr. Vogel stated that:

> [Mr. Kroll] continues to have headaches that he says "keep him down."  However, we have been able to slowly taper his Methadone as planned. He has not been able to work.  He complains of significant sleep difficulties when his headaches are bad.

(AR 00153)  Dr. Vogel reported that Mr. Kroll was an "alert, comfortable-appearing gentleman who is actually quite talkative and pleasant."  During this visit, Mr. Kroll asked Dr. Vogel for narcotics, stating that it was the only thing that helped with his head pain.  Dr. Vogel discussed at length with Mr. Kroll and his wife that she believed Mr. Kroll was having "some rebound headache from the Methadone" and it was advisable to get him off of this medication as soon as possible.[10]  Dr. Vogel also stated:

> [Methadone] does have a half life so I am not sure why [Mr. Kroll] reports such headaches at the end of a Methadone dose. I do not believe that all of his problems are clearly on the basis of head pain.

(AR 00153)  During this examination time, Dr. Vogel diagnosed Mr. Kroll with "[r]efractory headaches complicated by narcotic overuse" and also noted a "possible

---

[10] As of this visit, Mr. Kroll was taking 2.5 mg of Methadone twice a day or, we assume, once every twelve hours.  (AR 00153)

migraine and muscle contraction type headache."  (AR 00153)

On April 12, 2002, Dr. Vogel again saw Mr. Kroll for his "refractory headaches complicated by analgesic abuse."  Dr. Vogel reported that Mr. Kroll had successfully tapered off Methadone.  Although Mr. Kroll and his wife informed Dr. Vogel that his headaches were no better, Dr. Vogel reported that, upon reviewing Mr. Kroll's self-kept headache journal,"clearly [Mr. Kroll's] notes indicate that [the headaches] have decreased somewhat in frequency and intensity."  (AR 00151)

During the exam, Dr. Vogel observed that Mr. Kroll was pleasant, "very talkative and actually appears quite comfortable despite his complaints of a headache."  However, she also stated that:

> [Mr. Kroll] has a lot of pain over the back of the right head and says that when he was hospitalized at IU, he thinks he responded to an occipital nerve block.

(AR 00151)  Dr. Vogel concluded Mr. Kroll had "[c]hronic headaches complicated by multiple factors" with a "[p]ossible occipital neuralgia playing role in his headaches."  (AR 00151)  Following the exam, Dr. Vogel performed a right occipital nerve block on Mr. Kroll.  (AR 103)

On May 10, 2002, Dr. Vogel again saw Mr. Kroll for his "refractory daily headaches complicated by analgesic abuse," reporting that Mr. Kroll's "neurologic examination is unchanged from the notes documented in the past" and that Mr. Kroll appeared pleasant, talkative, and quite comfortable "despite his complaints of a severe headache." (AR 00149) Regarding the occipital nerve block, Dr. Vogel remarked: "We

13

did try an occipital nerve block, but [Mr. Kroll] felt it was worse rather than better for a few days following the injection."  (AR 00149)  Dr. Vogel altered her diagnosis of Mr. Kroll as follows:

> Chronic daily headaches. I do not think this appears migraine. I suspect that there is some rebound headache and possibly some secondary issues [sic] There seems to be some component of myofascial pain, however.

(AR 149)

On May 30, 2002, Mr. Kroll began physical therapy with Innovative Therapy Services in response to the recommendation of Dr. Vogel.  (AR 00141-42)

H.   *Prudential denies Mr. Kroll' s application for LTD Benefits.*

The parties agree that at some point Mr. Kroll applied for LTD benefits from Prudential; however, it is not clear exactly when Mr. Kroll made this application[11] Prudential's "S.O.A.P.,"[12] dated April 17, 2002, noted that Mr. Kroll "… was in [the hospital] due to Migraine, was [treated with] Morphine, needed to detox while there." (AR 00055)  The S.O.A.P. also stated that the etiology of Mr. Kroll's migraines was currently unknown.  (AR 00055)

Prudential's S.O.A.P., dated May 22, 2002, stated that Mr. Kroll was admitted to the hospital "… for migraine and narcotic abuse/addiction," noting that:

> It appears that [Mr. Kroll] decided to change [attending physician]

---

[11] The parties never specify when Mr. Kroll initially applied for LTD benefits.

[12] The parties do not define S.O.A.P., but we believe S.O.A.P. is an acronym for "Subjective Objective Assessment Plan."

> after 11/2/01 office visit … Is this because he was released to [return to work] and did not wish to [return to work] due to job issues?

(AR 00056)

In Prudential's S.O.A.P. notation dated May 23, 2002, Prudential reported that a review of the medical records indicated that Mr. Kroll had improved "to baseline" as of November 2, 2001.  Prudential concluded, "There is no obj[ective] medical documentation to support [Total Disability] throughout [the Elimination Period] as effective 11/02, [Mr. Kroll] much improved."  (AR 00057)

Prudential made the decision to deny Mr. Kroll's claim for LTD benefits on May 30, 2002.  (AR 00130)  In its decision letter to Mr. Kroll, Prudential wrote that Dr. Hake noted a long history of migraines and depression.  Prudential also noted Dr. Hake's report in October 2001 of "improvements in [Mr. Kroll's] headaches" and her assessment in November 2001 that Mr. Kroll was improving.  (AR 00131)

Prudential observed that Dr. Hake gave Mr. Kroll a return-to-work slip for November 26, 2001, after the November 2001 visit.  The denial letter stated that Mr. Kroll's "… job duties were described as primarily sedentary" and that "a review of [the November 2002] office visit note indicates you had returned to your baseline level of functioning."  Finally, Prudential noted that Dr. Vogel reported no neurological signs or symptoms, and neurological examination was unchanged.  (AR 00131)[13]

---

[13] In its decision letter to Mr. Kroll, Prudential also noted that Dr. Vogel's May 10, 2002 letter stated that Mr. Kroll was no longer having daily headaches.  (AR 00131)  However, Dr.

(continued...)

Having reviewed the above information, Prudential informed Mr. Kroll that it had determined he did not meet the definition of Total Disability under the Plan "as there is no medical documentation to support an inability to perform the Material and Substantial duties of your occupation. . . ."  (AR 00131)  Mr. Kroll was also informed of his right to two levels of appeal.  (AR 00132)

I.    *Mr. Kroll's First Appeal.*

Mr. Kroll appealed the denial of LTD benefits within the required 180 days.  (AR 134)  In his first appeal, Mr. Kroll stated:

> I understand that the initial review determined that I was at my baseline status as of November 26th and could have returned to work. This could not be further from the truth. At that time I was still on methadone, which the physicians were trying to wean me off of and it was taking longer than expected.

(AR 00134)  Regarding the Methadone, Mr. Kroll explained:

> Dr. Vogel, upon seeing me for the first time on 12-4-01, stated that I could not go back to work until I was off the methadone.  The methadone significantly impaired my ability to sleep, concentration, my memory and my activity tolerance.  During the time I was on methadone, my headaches were somewhat better but far from controlled and I could not function well enough to work while on the methadone.

(AR 00134)  Mr. Kroll's first appeal also stated that "[a]s of November [2001], I was unable to tolerate more than 2 hours of activity outside of my home and interacting with

---

[13](...continued)
Vogel later corrected this typo in the letter and stated instead that Mr. Kroll had reported having daily headaches.  (<u>See</u> AR 00134, AR 00149)

people."  Mr. Kroll further explained that "[w]hile it is true that I have a long history of migraines, upon admission to the hospital and since, the condition has changed to one of refractory headaches vs. migraines that could be treated with prescribed pain medications so that I could continue to work."  (AR 00134)  Finally, Mr. Kroll state:

> The only narcotics for treatment of the migraines that I have used were prescribed by my physician(s) and used per their instructions. I did not abuse the narcotics; they were prescribed as medical treatment and used as such.

(AR 00135)

J.    *Additional Medical Records Supplied for First Appeal.*

On July 25, 2002, Prudential advised Mr. Kroll that it would be seeking additional medical information from Dr. Vogel regarding his treatment.  (AR 00139)  On July 18, 2002, Prudential requested from Dr. Vogel all medical records to date in order to determine Mr. Kroll's eligibility for benefits.  (AR 00146)

Prudential received Dr. Vogel's office visit notes for June 21, 2002.  In that visit, a followup for Mr. Kroll's "refractory chronic daily headaches," Dr. Vogel observed:

> [Mr. Kroll] says that he is a little bit better, but still has almost daily headaches. At times the headaches are so bad that he does nothing but lay in bed, but usually he is able to function to the point that he can play with his son.

(AR 00148)  Dr. Vogel also noted that Mr. Kroll "appears quite comfortable despite his complaints of a severe headache."  All the physical tests performed by Dr. Vogel were reported as normal.  Dr. Vogel mentioned that Mr. Kroll had been attending physical therapy, which Mr. Kroll believed was helping him.  Dr. Vogel concluded that Mr. Kroll

17

suffered from "[c]hronic daily headaches complicated by analgesic abuse and rebound." (AR 00148)

On July 8, 2002, the physical therapist treating Mr. Kroll prepared a report, titled "Updated Plan of Progress," which also was submitted to Prudential.   The report disclosed that Mr. Kroll had a  "decreased frequency of high intensity pain over the last 4 weeks;"  "is using the Codeine medicine less than everyday;" and "was able to tolerate approximately 40% more time outdoors in sunlight and heat this past weekend than he could 6 weeks ago."  (AR 00141)  The report further noted that Mr. Kroll's "[h]eadache pattern can now be reproduced [with] a combination of 1st rib depression and R SC joint distraction."  (AR 00141) The physical therapist opined:

> We seem to be making a dent in the headache pattern.  I still feel quite strongly that incorrect force attenuation at the foot, incorrect prosthetic leg length and alignment and uneven pelvic girdle are associated [with] this headache pattern. This is born [sic] out by the ability now to reproduce the headache sensation when working on the thoracic and cervical erector spinae musculature.

(AR 00141)

K.    *Prudential denies Mr. Kroll's first appeal.*

Prudential's S.O.A.P. dated July 11, 2002, noted that Mr. Kroll advised Prudential in his first appeal "… that he switched [attending physicians] and began [treating] in 12-01 [with a doctor] who specializes in migraines and who [advised him that] he could not [return to work]."  (AR 00058)

In Prudential's August 21, 2002, S.O.A.P., Mr. Kroll was reported to be out of

work because of  "migraine headaches/narcotic addiction."  Prudential noted that, "testing

(mra, mri, labs) have been negative" and that Dr. Vogel consistently observed Mr. Kroll

being pleasant, talkative and appearing comfortable during exams.  Prudential observed

that the medical records indicate that Mr. Kroll has some issues regarding narcotic abuse

and that Dr. Vogel "feels [headaches] are rebound in nature."  (AR 00059)  Prudential

observed that "[h]eadaches are typically not a condition that would impair someone from

working," and concluded that the information in Mr. Kroll's file did not support a "severe

functional impairment that would preclude" from working.  (AR 00059)  Finally,

Prudential remarked that "[t]here are lack of medical findings to support [Mr. Kroll's]

complaints."  (AR 00059)

     Prudential's S.O.A.P. dated August 23, 2002, noted that Mr. Kroll was out of work

for "migraines [and] narcotics abuse/addiction."  In addition, Prudential noted that Mr.

Kroll was released to return to work by Dr. Hake and appeared to have returned to at least

a baseline predisposition level of headache with which Mr. Kroll had worked in the past.

Prudential concluded that the medical documentation did not support the conclusion that

Mr. Kroll remained disabled throughout the Elimination Period.  (AR 00060)   Finally,

the S.O.A.P. noted that Mr. Kroll had "… switched [attending physician] to [doctor]

specializing in [headache] who took him [out of work]."  (AR 00060)

     In Prudential's S.O.A.P. dated September 3, 2002, Prudential reported that its

associate medical director had reviewed Mr. Kroll's medical records and indicated that

she concurred with the conclusions of Prudential's S.O.A.P. note dated August 21, 2002.

(AR 00061)

On September 10, 2002, Prudential informed Mr. Kroll that it was affirming its prior decision to deny LTD benefits (AR 00168), stating that its review of the medical records indicated that Mr. Kroll's condition had returned to his baseline, pre-disability condition, and that Mr. Kroll's sickness would not prevent him from performing the material and substantial duties of his occupation.  (AR 00169)  The denial letter also stated:

> You appealed our decision indicating you changed physicians
> from Dr. Hake to Dr. Vogel as you wanted a physician with
> more expertise in headaches, that Dr. Vogel indicated you
> were unable to work until you were off methadone, and that
> you remain unable to work because of constant pain.

 (AR 00169)  Prudential's denial letter does not otherwise address Mr. Kroll's contention that he was disabled as a result of his methadone treatment or that his diagnosis had changed from migraine headaches to refractory headaches.  (AR 00168-00170) Prudential remarked that "Dr. Vogel's records indicate successful treatment with medication adjustments resulting in improvements in your chronic headaches and withdrawal from narcotic medication usage."  (AR 00170)

Prudential ultimately concluded:

> While you may experience discomfort from your headaches, and
> may require continuing medical care, the medical documentation
> does not support that your condition would prevent you from
> performing the material and substantial duties of your occupation
> throughout the Elimination Period. Additionally, the medical
> documentation does not support that your condition in the period
> after your hospitalization was substantively worse than your

predisability condition, with which you worked.

(AR 00170)  Prudential then notified Mr. Kroll of his right to a second appeal of

Prudential's decision.  (AR 00170)

L.    *Mr. Kroll's Second Appeal.*

In Mr. Kroll's letter of March 17, 2003, he notified Prudential of his decision to

appeal Prudential's eligibility determination.  In this second appeal, Mr. Kroll specifically

took issue with the characterization that he had a drug abuse problem, explaining that

"[t]he narcotics in question were prescription narcotics prescribed as treatment for [his]

headache condition."  Mr. Kroll also characterized the back-to-work note issued by Dr.

Hake as "optimistic speculation," claiming that Dr. Hake's practice was to issue a return-

to-work statement for a date certain and then retract it prior to the date. (AR 00255)

Along with this appeal letter, Mr. Kroll attached updated medical records from Dr. Vogel

and Dr. Gerald Yarnell, ("Dr. Yarnell"), his anaesthesiologist.  (AR 00255-00333)  On

March 21, 2003, Prudential acknowledged to Mr. Kroll its receipt of his request for a

second appeal.  (AR 00334)

M.    *Additional Medical Records Supplied for Second Appeal.*

On June 4, 2002, Dr. Vogel had written a prescription note which stated that Mr.

Kroll was having daily headaches.  (AR 00258)

On September 18, 2002, Mr. Kroll received a botulinum toxin injection performed

by Dr. Kevin J. Puzio.  (AR 00262)

On November 1, 2002, Dr. Vogel saw Mr. Kroll for his "refractory daily

headaches."  In her office visit notes, Dr. Vogel stated that Mr. Kroll was last seen several

months ago.  At the time of the November 1st visit, Dr. Vogel reported that Mr. Kroll

seemed pleasant and that "fortunately" he was no longer on daily narcotics.  Dr. Vogel

noted that Mr. Kroll "has had extensive evaluations done here and elsewhere that have

not shown any secondary causes."  (AR 00264)  Dr. Vogel further noted that:

> [Mr. Kroll] says that he gets some form of a headache every day that
> is particularly bad with any activity. He says that he is unable to
> return to work.

(AR 00264)  Regarding the success of the botulinum toxin injection, Dr. Vogel remarked

that "if anything, [the injection] worsened his daily headaches."  According to Dr. Vogel,

Mr. Kroll had started a trial of Zonegram, an anti-convulsant, which "[was] showing

some promise in refractory migraine treatment."  Finally, Dr. Vogel stated that she

"emphasized again that daily narcotics are not the way to go."  (AR 00264)

On December 13, 2002, Dr. Vogel again saw Mr. Kroll for his "refractory daily

headaches,"  noting that:

> [Mr. Kroll] has not been able to go to work. He says he gets a
> headache every day and can't do anything but sit around the house.
> He says it makes him short tempered.

(AR 00265)  However, she also stated that upon examination Mr. Kroll was pleasant,

talkative, and "actually appeared quite comfortable despite his complaints of a headache."

At this examination, Dr. Vogel's recorded her impression of Mr. Kroll's condition in

these words:

> Refractory daily headaches. We have tried every possible modality I

22

> can think of including multiple medications, on- and off-label drugs
> for migraine prevention and treatment, acupuncture, Botulinum
> toxin, and aggressive physical therapy.

(AR 00265)  Dr. Vogel noted her belief that "there is probably some secondary gain playing a role in this case as well."[14]   Finally, Dr. Vogel stated that she did not believe that she had much else to offer Mr. Kroll in the manner of treatment for his condition and "[a]t this point, I suggested [Mr. Kroll] try to increase his activity level and see if he can 'work' through the headache."  (AR 00265)

On February 8, 2003, Mr. Kroll underwent a number of tests on his spine.  (See AR 00305-00312)[15]  Concerning Mr. Kroll's "MRI Scan Thoracic Spine w/o Contrast," Dr. Kent Remley ("Dr. Remley"), the interpreting physician, concluded that there was "no evidence of thoracic disc herniation, cold compression, or spinal stenosis."  (AR 00306)  According to Dr. Remley, Mr. Kroll's "MRI Scan Cervical Spine w/o Contrast" also indicated "no abnormalities identified involving the spinal cord or craniovertebral junction."  (AR 00308)  In addition, Dr. Remley's report on Mr. Kroll's cervical spine exam reported: "No findings to suggest significant disc generation . . . unremarkable appearance of the craniovertebral junction."  (AR 00312)

---

[14] Prudential provided the two following definitions of secondary gain:  "The external gain derived from any illness, such as personal attention and service, monetary gains, disability benefits, and release from unpleasant responsibilities." (http://www.health-dictionary.com/mental-health-term-details/Secondary-gain); " Interpersonal or social advantages gained indirectly from organic illness, such as an increase in attention from others."  (The American Heritage Stedman' s Medical Dictionary, 2001 Edition).

[15] Mr. Kroll appears to have been referred by Dr. Yarnel for the testing.

On February 20, 2003, Dr. Vogel again saw Mr. Kroll for his "refractory headaches." During this visit, Dr. Vogel noted:

> [Mr. Kroll] is about the same since I saw him last in December. He still gets the severe headaches every couple of days and any activity, even mild, brings on some sort of a headache.

(AR 00266) Dr. Vogel noted that Mr. Kroll was a "pleasant, moderately obese gentleman who again appeared comfortable despite the complaints of headache." Dr. Vogel reported, "We have tried just about everything and have run out of options;" however, she mentioned trying a treatment involving a low dose of Kadian, "a long-acting narcotic, with almost no abuse potential." During this visit, Dr. Vogel's impression of Mr. Kroll was that he had "[r]efractory daily headaches with life-altering pain." (AR 00266)

Mr. Kroll filled out a Pain Questionnaire at Dr. Gerald R. Yarnell's ("Dr. Yarnell") request in late 2002 or early 2003. In the questionnaire, Mr. Kroll reported that (1) his current pain was a "5 out of 10;" (2) his normal pain was a "5 out of 10;" (3) his least pain was a "2 out of 10;" and (4) his worst pain was a "20 out of 10." (AR 00292) Mr. Kroll reported pain levels from "2 to 10+" throughout the day, even at bedtime. (AR 00293)

During Mr. Kroll's March 3, 2003, exam with Dr. Yarnell, Mr. Kroll reported his headache pain as a "3 out of 10." (AR 00317)

N.    *Independent File Review Conducted by Dr. Martin Steiner.*

On April 30, 2003, Prudential requested that Dr. Martin Steiner ("Dr. Steiner"), a board-certified neurologist for thirty years, conduct an Independent File Review of Mr.

24

Kroll's medical records.  (AR 00336, AR 00496-00498)  In the engagement letter to Dr.

Steiner, Prudential specifically requested Dr. Steiner's medical opinion concerning

whether "Mr. Kroll would be capable to perform [sic] the duties of his regular occupation

due to migraines."  (AR 00336)  Prudential did not ask Dr. Steiner to consider whether

Mr. Kroll was disabled due to his refractory headaches or as a side effect of his

methadone treatment.  If Dr. Steiner were to find Mr. Kroll unable to perform his regular

occupation, Prudential asked that specific details be provided regarding Mr. Kroll's work

capacity and possible treatment.  In addition, Prudential requested that Dr. Steiner discuss

"any other condition noted which may impact [Mr. Kroll's] ability to return to work."

(AR 00336)

Dr. Steiner submitted his report on May 7, 2003, to Prudential, in which he

indicated that he had reviewed Mr. Kroll's medical file, including records from Mr.

Kroll's attending physicians, Dr. Yarnell, Dr. Vogel, and Dr. Hake.  (AR 00496)  Dr.

Steiner also reviewed Mr. Kroll's current job description.  (AR 00496, 00337-00341)

However, Dr. Steiner apparently was not provided any of the appeal letters submitted to

Prudential by Mr. Kroll.  (AR 00496)

In his report of May 7, 2003, Dr. Steiner answered the question of whether Mr.

Kroll was capable of performing his regular occupation due to migraines, stating:

> This question is obviously next to impossible to answer since Mr.
> Kroll's problems are purely subjective.  Based on the information
> contained in the records. [sic] however, it appears that despite Mr.
> Kroll's complaints of severe pain and discomfort, he was perfectly
> capable of functioning and in actuality appeared quite comfortable

> [sic] This is based on the reports of Dr. Vogel as well as the reports
> of Dr. Hake.  With this information in hand, it appears to me that Mr.
> Kroll has more of an abuse problem with analgesics than he does a
> problem with headache pain.  Consequently I feel that he should be
> capable of performing as a computer specialist.

(AR 00497)  Dr. Steiner's opinion was based on the records of Dr. Vogel as well as the

reports of Dr. Hake, and he concluded by observing, "The above opinions are based on

the information that has been provided . . . I have also based my opinions on reasonable

medical probability."  (AR 00497-00498)

O.    *Prudential Denies Mr. Kroll's Second Appeal.*

Prudential's May 15, 2003, S.O.A.P. concluded that "the medical  information in

file does not provide evidence of an impairment throughout the [Elimination Period] or

that the migraines are so severe as to prevent him from performing the duties of his [own

occupation]."  Continuing, Prudential's S.O.A.P. provided:

> As depression and narcotic abuse has [sic] been noted, [Mr. Kroll]
> went [out of work] due to migraines and is not claiming disability for
> these conditions. In addition, there is no evidence of any treatment
> for these other conditions.

(AR 00063)[16]

In a letter dated May 20, 2003, (AR 00500), Prudential informed Mr. Kroll of its

decision affirming its denial of LTD benefits, as follows:

> While we recognize Mr. Kroll has headaches, review of the medical

---

[16] We find this statement from Prudential quite curious since, from our understanding of
the record, Mr. Kroll was placed on Methadone in order to treat his perceived narcotic addiction.

> information in file does not indicate they would be sufficiently severe to prevent him from performing the duties of his own occupation as a Senior Network Analyst during the Elimination Period. . . . Although Mr. Kroll was hospitalized from September 10, 2001 through September 22, 2001, the medical information in file documents his condition returning to baseline prior to his release from the hospital.

(AR 00501)  The May 20, 2003, denial letter fails to address whether Mr. Kroll was disabled as a result of his methadone treatment or the significance, if any, of the change in his diagnosis from migraine headaches to refractory headaches.

In the same letter, Prudential informed Mr. Kroll of his right to a voluntary, third appeal.  Prudential wrote that "the appeal may identify the issues and provide other comments or additional evidence you wish considered."  (AR 00501)  Prudential closed this letter by informing Mr. Kroll that he also had the option of filing a lawsuit under ERISA and that his decision regarding whether or not to file a third appeal did not preclude bringing an ERISA lawsuit.  (AR 00502)

On October 31, 2003, Mr. Kroll filed this suit under ERISA, challenging Prudential's decision denying him LTD benefits.

Legal Analysis

A.   *Standard of Review*

Benefit determinations in ERISA cases pursuant to 29 U.S.C. § 1132(a)(1)(B) are reviewed by the court *de novo*, unless the plan administrator has "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  If the plan vests discretionary authority

in the plan administrator, the standard of review by the court is based on an "arbitrary and capricious" analysis.  Hightshue v. AIG Life Ins. Co., 135 F.3d 1144, 1147 (7th Cir. 1998); see also Morgan v. Cigna Group Ins., 2003 WL 722804, *6 (S.D.Ind. 2003) (Barker, J.).

Here, the Policy grants discretionary authority to Prudential; there is no dispute between the parties on this.  Accordingly, our review of Prudential's denial of benefits to Mr. Kroll proceeds according to the "arbitrary and capricious" standard, which entails a review of the administrator's decision in terms of whether it was reasonable.  Morgan, 2003 WL 722804, * 6; Schaub v. Consolidated Freightways, Inc. Extended Sick Pay Plan, 895 F.Supp. 1136, 1140 (S.D.Ind. 1995) (Barker, C.J.).  For a decision to be deemed reasonable, an administrator must be found to have "consider[ed] the factors that are relevant to the important aspects of the decision, and articulate[d] an explanation that makes a 'rational connection' between the issue, the evidence, the text and the decision made."  Schaub, 895 F.Supp. at 1140 (citing Cuddington v. Northern Indiana Public Service Co. (NIPSCO), 33 F .3d 813, 817 (7th Cir. 1994; Exbom v. Central States, Southeast and Southwest Area Health and Welfare Fund, 900 F.2d 1138, 1142-43 (7th Cir. 1990)).

Thus, our function in conducting this review is not "to decide whether we would reach the same conclusion as the Plan or even rely on the same authority."  Mers v. Marriott International Group Accidental Death and Dismemberment Plan, 144 F.3d 1014, 1021 (7th Cir. 1998) (citing Cvelbar v. CBI Ill. Inc., 106 F.3d 1368, 1379 (7th Cir.

28

1997)).  We can conclude that the administrator's decision was arbitrary and capricious only if we are very confident that the plan administrator overlooked something important or otherwise seriously erred in appreciating the significance of the evidence.  Patterson v. Caterpillar, Inc., 70 F.3d 503, 505 (7th Cir. 1995); see also  Morgan, 2003 WL 722804, *6 (stating: "An administrator's decision is arbitrary and capricious if the administrator entirely failed to consider an important aspect of the problem or offered an explanation for its decision that runs counter to the evidence").  We must not set aside a plan's denial of benefits "if the denial was based on a reasonable interpretation of the plan documents." Mers, 144 F.3d at 1021 (citing Loyola Univ. v. Humana Ins. Co., 996 F.2d 895, 898 (7th Cir.1993)).  Finally, when evaluating a plan administrator's decision under the arbitrary and capricious standard, a court generally considers only the evidence that was before the administrator when it made its decision.  Hess v. Hartford Life & Accident Insurance Co., 274 F.3d 456, 462 (7th Cir. 2001) (citing Trombetta v. Cragin Fed. Bank for Sav. Employee Stock Ownership Plan, 102 F.3d 1435, 1437 n.1 (7th Cir. 1996)).

Even under the deferential arbitrary and capricious standard, "we will not uphold a termination when there is an absence of reasoning in the record to support it."  Hackett v. Xerox Corp. Long-Term Disability Income Plan, 315 F.3d 771, 774-75 (7th Cir. 2003). "ERISA requires that specific reasons for denial be communicated to the claimant and that the claimant be afforded an opportunity for 'full and fair review' by the administrator."  Id. at 775 (citing Halpin v. W.W. Grainger, 962 F.2d 685, 688-89 (7th Cir. 1992)).  In this regard, the Seventh Circuit has noted that "substantial compliance is

29

sufficient to meet this requirement." <u>Id.</u> (citing <u>Halpin</u>, 962 F.2d at 690).

Substantial compliance is necessarily a fact-intensive undertaking in which the court is "guided by the question of whether the beneficiary was provided with a statement of reasons that allows a clear and precise understanding of the grounds for the administrator's position sufficient to permit effective review. <u>Id.</u> (citing <u>Halpin</u>, 962 F.2d at 690 and 694). In order to meet the "standard of substantial compliance 'the administrator must weigh the evidence for and against [the denial or termination of benefits], and within reasonable limits, the reasons for rejecting evidence must be articulated if there is to be meaningful appellate review.'" <u>Id.</u> (quoting <u>Halpin</u>, 962 F.2d at 695). On the other hand, "[c]onclusions without explanation do not provide the requisite reasoning and do not allow for effective review." <u>Id.</u> (citing <u>Halpin</u>, 962 F.2d at 693).

B.    *Analysis of Prudential's decision denying Mr. Kroll LTD Benefits.*

Applying the arbitrary and capricious standard of review, it is clear that Prudential's initial and subsequent denials of Mr. Kroll's appeals did not substantially comply with the requirements of ERISA. We have identified four major problems with Prudential's decision making and review process: (1) Prudential failed to respond directly to the stated grounds for Mr. Kroll's appeals; (2) the denial letters lacked an explanation of the reasoning in support of Prudential's conclusions; (3) Prudential unreasonably disregarded certain medical evidence and opinions of Dr. Kroll's physicians which were contrary to Prudential's stated opinion; and (4) the independent medical review requested

30

by Prudential, and upon which it relied, reflected these same three deficiencies.[17]  We

address each conclusion in turn.

> (1)    *Prudential Failed to Respond to the Express Grounds for Mr. Kroll's*
>         *Appeals.*

The most glaring deficiency in Prudential's review is its failure to

consider/respond to specific information submitted by Mr. Kroll.  Mr. Kroll, who

exercised his right to appeal the initial denial of LTD benefits, never received from

Prudential a direct response to the central grounds for his appeals, namely that: (a) Mr.

Kroll was unable to work while taking Methadone, (b) Mr. Kroll's diagnosis had changed

from migraine to refractory headaches, and (c) Mr. Kroll was unable to tolerate long-

periods of time away from his house.  Prudential's denial letters never addressed any of

these claims.

To our admittedly inexpert eye, Mr. Kroll's contentions do not appear wholly

incredible since, at the time of the first appeal, there was plausible evidentiary support for

each of these grounds in the medical record.  This is not to say that we are able to fully

credit Mr. Kroll's contentions; indeed, we lack the knowledge that would allow us to

know whether they deserve such credit.  In any event, it is beyond our proper role to pass

on the validity of the issues Mr. Kroll has raised.  See Mers, 114 F.3d at 1021.

We can and do, however, evaluate Prudential's review procedures, which

---

[17] These four failures should not be viewed as a comprehensive, all-inclusive list of the deficiencies evident in Prudential's decision letters and review process.  We have singled out these four specific deficiencies because they represent fundamental failings that have impeded both our review and acceptance of Prudential's conclusions.

evaluation brings us to the conclusion that the process fell far short of being a "full and fair review."  The plan administrator, for example, entirely failed to respond to certain contentions raised by My Kroll or to provide him with "a statement of reasons that allowed a clear and precise understanding of the grounds for the administrator's position [on these contentions.]"  See Hackett, 315 F.3d at 775 (citing Halpin, 962 F.2d at 690 and 694).  Prudential's failure to address these issues during the administrative review process prevents us from passing on the reasonableness of Prudential's denial of Mr. Kroll's appeals and, without such a response by Prudential, its denial decision must be deemed arbitrary and capricious.  See  Patterson, 70 F.3d at 505; see also  Morgan, 2003 WL 722804, *6.

(2)   *Prudential Provided Conclusions Without Explanations.*

The second major problem with Prudential's denial letters is that they are essentially conclusory statements lacking sufficient reasoning to allow effective review by the court.  Prudential's denials in each instance were perfunctory, concluding that Mr. Kroll was not disabled throughout the elimination period, but lacking support or explanation for that conclusion.

To the extent Prudential provided any explanation, it became subsumed and perpetuated in each successive determination.  For example, Prudential's initial denial letter stated that "a review of [the November 2002] office visit note indicates you had returned to your baseline level of functioning."  (AR 00131)  In the letter denying the first appeal, Prudential asserted "the medical documentation does not support that your

condition in the period after your hospitalization was substantially worse than your

predisability condition, with which you worked.  Therefore, we have upheld our decision

to disallow your LTD claim."  (AR 00170)  In the letter denying the second appeal,

Prudential again advanced the view that "the medical information in file documents his

condition returning to baseline prior to his release from the hospital."  (AR 00501)[18]

Unfortunately, since Prudential did not explain the basis for any of these

determinations, we are foreclosed from being able to evaluate their reasonableness.  For

example, Prudential did not explain what Mr. Kroll's "baseline" was or explain in what

way(s) Mr. Kroll had returned to that status subsequent to his hospitalization.  We are left

to speculate concerning whether Prudential believed that Mr. Kroll's headaches had

returned to pre-hospitalization levels in terms of frequency, duration, or severity (or some

combination of the three), or whether Prudential believed that side-effects from Mr.

Kroll's narcotic medications were the cause of any differences between his pre-

hospitalization and post-hospitalization condition.  Due to the paucity of explanation in

Prudential's denial letters, we are unable to ascertain what thought process, if any, led to

Prudential's conclusions.  Moreover, this sort of vagueness essentially denied Mr. Kroll

an opportunity to present a meaningful response to Prudential's denial letters.

Prudential's denial letters did not "allow[] a clear and precise understanding of the

---

[18] We are unclear as to whether these three assessments were meant to be considered
together reflecting the evolution of Prudential's opinion or if we should examine each of them
separately as a distinct justification for denying Mr. Kroll's claim.  Our examination of the
administrative record did not resolve this uncertainty.

grounds for the administrator's position" and, consequently, effective judicial review has been foreclosed.  See Hackett, 315 F.3d at 775 (citing Halpin, 962 F.2d at 693).  Because the standards required by ERISA for a "full and fair review" were not met, Prudential's denials of Mr. Kroll's requests for benefits are insufficient as a matter of law.[19]

 (3) *Prudential Unreasonably Disregarded Contrary Evidence in the Record.*

 The third major flaw in Prudential's denial letters is that they rejected, without explanation, considerable evidence in the administrative record that Mr. Kroll was in fact disabled.  Prudential's denial letters are marked by selectively optimistic excerpts culled from Mr. Kroll's medical records, offered in support of its conclusion of no medical disability.  Despite these selectively optimistic statements relied upon by Prudential, we find no evidence in the administrative record that any treating physician ever diagnosed Mr. Kroll as able to work during any of the specific times referenced by Prudential.  To the contrary, Mr. Kroll was consistently diagnosed as unable to work during the entire elimination period.[20]  Prudential never attempted to reconcile the actual diagnoses of the attending physicians with its view that Mr. Kroll could return to work, nor did Prudential

---

 [19] Assuming *arguendo* that Mr. Kroll's condition had returned to his pre-hospitalization "baseline," which he had endured while remaining employed, that would not necessarily establish that he was not disabled, since the Seventh Circuit has repeatedly held that "employment is not proof positive of ability to work."  Wilder v. Apfel, 153 F.3d 799, 801 (7th Cir. 1998); (citing Wilder v. Chater, 64 F.3d 335, 337 (7th Cir. 1995); O'Connor v. Sullivan, 938 F.2d 70, 72-73 (7th Cir. 1991) Kelley v. Callahan, 133 F.3d 583, 588 (8th Cir. 1998)).

 [20] The possible exception would be Dr. Hake's return-to-work note dated November 26, 2001; however, Prudential never attempts to reconcile this note with the other evidence of record.  See, infra Note 21.

provide any explanation of its reasons for believing the diagnoses of the attending

physicians were incorrect and its optimistic assessments were more reliable indicators of

Mr. Kroll's actual condition.[21]  Although Prudential is not required to "accord special

weight" to Mr. Kroll's attending physicians, it "may not arbitrarily refuse to credit a

claimant's reliable evidence, including the opinions of a treating physician."   Black &

Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).

Prudential's denial letters do not reflect a "full and fair review" of the evidence in

support of Mr. Kroll's disability claim.  The denial letters make no mention of the fact

that Mr. Kroll's treating physicians had opined that he was unable to work, unable to

---

[21] For example, Prudential points to several quotes from the September 22, 2001, IU
Medical Center discharge statement, such as Mr. Kroll was in "good condition" upon his
discharge to Dr. Hake's care.  (AR 00199)  However, Prudential does not address why less than
a month later, on October 9, 2001, Dr. Hake described Mr. Kroll as "continuing to improve" but
apparently believed he was still not ready to return to work since the return-to-work note was not
issued until November 2001.  (AR 00200)  It strains credulity to suggest that these medical
records, when read together, establish that Mr. Kroll was able to return to work upon his
discharge.
    Prudential also places great stock in the return-to-work note dated November 26, 2001,
issued by Dr. Hake to Mr. Kroll.  Mr. Kroll contends the return-to-work note was overly
optimistic, that Dr. Hake had previously issued return-to-work notes only to later retract them
(prior to the return to work date).  There is no evidence in the record, other than Mr. Kroll's
assertion, that Dr. Hake issued any prior return-to-work notes.  Despite this lack of direct
evidence, there is reason to believe that Dr. Hake's November 2001 prognosis was in fact overly
optimistic.  For example, Dr. Hake had hoped that by November 26, 2001, the return-to-work
date, Mr. Kroll's Methadone dosage would be reduced to 5 mg every twelve hours.  In fact, Mr.
Kroll did not achieve this targeted reduction in dosage until sometime in March 2002, several
months after Dr. Hake had initially hoped.  Moreover, during the visit in which Dr. Hake
prepared the return-to-work note, she also recorded that Mr. Kroll could tolerate only three hours
of activity a day.  One month later, Dr. Vogel stated that Mr. Kroll was unable to work.  We find
no evidence in the administrative record suggesting that Kroll's condition underwent a dramatic
improvement and then a subsequent decline during that intervening month.  Prudential never
explains why either of the two treating physicians' inconsistent diagnoses was wrong at the time
it was given.

tolerate extended periods of time outside his home, often bed ridden due to pain, or any of the other not insubstantial references in Mr. Kroll's medical records that provide plausible support for his claim of disability.  Further, Prudential's denial letters give no indication that it "weigh[ed] the evidence for and against [the denial of benefits]" nor do they articulate "the reasons for rejecting evidence [in support of the claimant's disability claim]."  See Hackett, 315 F.3d at 775 (quoting Halpin, 962 F.2d at 695).  Because of these deficiencies, we lack a basis on which to conclude that Prudential's rejection of the opinions of Mr. Kroll's attending physicians as well as the other contrary evidence in the record was a reasonable decision.  Accordingly, because Prudential arbitrarily failed to credit relevant evidence in the record, its decisions cannot be deferred to by the court.

.       (4)    *Insufficiency of Dr. Steiner's Opinion.*

The fourth major deficiency in Prudential's review process is its unavailing attempt to buttress its thinly-supported conclusions with the unpersuasive conclusions of Dr. Steiner.  Dr. Steiner conducted his review and produced his report at the request of Prudential, ostensibly based on medical records from Mr. Kroll's treating physicians.[22] Instead of a reasoned analysis, Dr. Steiner provided only his conclusion that Mr. Kroll was not disabled.  In his report, there was no weighing of the evidence for or against such a finding, and there was no articulated analysis leading to his rejection of evidence indicating that Mr. Kroll was unable to work.  Consequently, once again, we are left

_____

[22] Prudential requested that Dr. Steiner determine only if Mr. Kroll was disabled as a result of migraines, making  no mention of refractory headaches or methadone treatment.

36

without any explanation justifying the difference between Dr. Steiner's opinion and Dr. Vogel's (or Dr. Hake's) diagnoses,[23] beyond the apparent impression that Dr. Steiner views the "glass half full" while Dr. Vogel views it "half empty."[24]  Had Dr. Steiner referenced the other physicians' opinions and explained his differences with them, we could have fully reviewed Prudential's denial of LTD benefits.[25]  Compounding the inadequacies of Dr. Steiner's analysis, Prudential's final denial letter provided no rationale for its decision to credit Dr. Steiner's opinion over the opinions of Dr. Vogel or Dr. Hake.  These bare "[c]onclusions without explanation do not provide the requisite reasoning and do not allow for effective review."  Hackett, 315 F.3d at 775 (citing Halpin, 962 F.2d at 693).  Because Dr. Steiner's report, and Prudential's reliance on that

---

[23] The only area of specific disagreement that Dr. Steiner highlights between his opinion and Dr. Vogel's is his (Steiner's) belief that Kadian is a narcotic subject to "misuse, abuse, and addiction."  (AR 00497)

[24] Dr. Steiner stated: "[I]t appears that despite Mr. Kroll's complaints of severe pain and discomfort, he was perfectly capable of functioning and in actuality appeared quite comfortable." (AR 00497)  Dr. Vogel's opinions appear to be exactly the opposite.  We read Dr. Vogel's reports to suggest that he believes, despite Mr. Kroll's periodic appearances of comfort and ability to function, Mr. Kroll continues to suffer severe pain and discomfort.  These opposing opinions are never reconciled; rather, we are simply presented with Dr. Steiner's conclusion that Mr. Kroll is able to perform his job responsibilities.

Moreover, Dr. Steiner prefaces his opinion, stating it "is obviously next to impossible to answer [whether Mr. Kroll was disabled because of migraines] since Mr. Kroll's problems are purely subjective." (AR 00497)  Assuming *arguendo* that Dr. Steiner's premise is true, he nonetheless could have provided an explanation as to why his interpretation of Mr. Kroll's condition was more probable or consistent with Mr. Kroll's expressed symptoms.  Instead, Dr. Steiner simply concludes that it is impossible to know the answer.  This strikes us as the epitome of an arbitrary determination.

[25] "Any non-arbitrary explanation [in his report] could show that he had weighed the evidence for and against.  We could, therefore, assume that any decision by the administrator took these factors into consideration."  Hackett, 315 F.3d at 775 (citing Halpin, 962 F.2d at 693).

report, do not substantially comply with ERISA requirements , thus foreclosing effective judicial review, the decision by Prudential cannot be upheld by the Court..

C.      *Remand to Prudential for Further Review.*

The critical failure here is that Prudential's denial letters do not substantially comply with the requirements of ERISA; thus, we need not turn our attention to the issue of an appropriate remedy.  "Normally, in an action for an inadequate denial letter, the remedy is to remand the case to the administrator for a full and fair hearing of the claim." Schleibaum v. Kmart Corp., 153 F.3d 496, 503 (7th Cir. 1998) (citing Wolfe v. J.C. Penney Co., Inc., 710 F.2d 388, 393 (7th Cir.1983)).  The Seventh Circuit has explained: "In a case where the plan administrator did not afford adequate procedures in its initial denial of benefits, the appropriate remedy respecting the status quo and correcting for the defective procedures is to provide the claimant with the procedures that she sought in the first place."  Hackett, 315 F.3d at 776 (citing Wolfe, 710 F.2d at 394); see also  Gallo v. Amoco Corp., 102 F.3d 918, 923 (7th Cir.1996), cert. denied, 521 U.S. 1129 (1997) (noting the appropriate remedy when a plan administrator fails to make adequate findings or to explain adequately its grounds is to send the case back to the administrator for further findings or explanation; this is the appropriate remedy in an ERISA action unless the case is so clear-cut that it would be unreasonable for the administrator to deny the application for benefits on any ground)).  Remand for further administrative procedures is therefore clearly appropriate, even though neither of the parties specifically requested this action by the court.

In light of the poor development of the administrative record, proceedings on remand should allow Mr. Kroll an opportunity to present a fresh and comprehensive appeal, including documents supporting his claim for LTD benefits.  Mr. Kroll is entitled to a meaningful administrative appeal of any adverse decision, an entitlement heretofore unfulfilled, given Prudential's failure to respond to the central contentions raised by Mr. Kroll in his previous appeals.  In providing this additional level of administrative proceedings, the administrative record can be augmented in the event Mr. Kroll again seeks judicial review of Prudential's decision under ERISA.  Prudential's responses to Mr. Kroll's submissions during the remand proceedings are to be made in accordance with ERISA and this opinion.

We further conclude that Mr. Kroll is not entitled to a substantive remedy from the Court in response to Prudential's procedural violation(s); we are "not in the place to make the determination of entitlement to benefits," since doing so would require us to "substitute [our] own judgment for that of the administrator," which we must not do. Hackett, 315 F.3d at 776 (citing Quinn v. Blue Cross and Blue Shield Ass'n, 161 F.3d 472, 478 (7th Cir. 1998); Gallo v. Amoco Corp., 102 F.3d 918, 923 (7th Cir.1996)).  The Seventh Circuit directs:  "The fact that the plan administrator failed to provide the adequate procedures does not mean that the claimant is automatically entitled to benefits--such a holding might provide the claimant 'with an economic windfall should she be determined not disabled upon a proper reconsideration.'"  Id. (quoting Quinn, 161 F.3d at 478)).  If Mr. Kroll were to prevail on remand, he would be entitled to retroactive

benefits from the time at which the initial denial occurred.  Id. (citing Wolfe, 710 F.2d at 394).

Conclusion

For the reasons set forth in detail above, we hold that Prudential's decisions did not substantially comply with ERISA requirements, rendering its denial of Mr. Kroll's disability claim arbitrary and capricious.   Accordingly, Plaintiff's Motion for Summary Judgment is GRANTED, Defendant's Motion for Summary Judgment is DENIED, and this case is remanded for further action consistent with this opinion.  This matter shall be administratively closed on the Court's docket, with leave to reopen within 30 days of a final decision on remand.[26]  IT IS SO ORDERED.

Date: _08/04/2005_____

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copy to:
Andrew W. Hull
HOOVER HULL BAKER & HEATH LLP
awhull@hooverhull.com

Jason Michael Kuzniar
WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
kuzniarj@wemed.com

---

[26] Plaintiff's request for briefing and/or a hearing on the question of attorney's fees and costs is taken under advisement pending final resolution of the underlying litigation.

Daniel John McMahon

WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
mcmahond@wemed.com

Alice McKenzie Morical
HOOVER HULL BAKER & HEATH LLP
amorical@hooverhull.com

Ronald E. Weldy
ABRAMS & WELDY
weldy@abramsweldy.com